UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 CIV 1151**

---------------------------------

ALLISON HALL,

                             Plaintiff,                 Case NO._____

    -against-

JOHN JAY COLLEGE OF CRIMINAL JUSTICE       COMPLAINT
of THE CITY UNIVERSITY OF NEW YORK and
THE CITY UNIVERSITY OF NEW YORK,

                        Defendants        DEMAND FOR
                                        JURY TRIAL

------------------------------------

STATE OF NEW YORK     )
                       : SS.:
COUNTY OF NEW YORK  )

### Jurisdiction

1. This court has jurisdiction under Title VII of the Civil Right Act of 1964.

### Venue

2. Venue is proper because the events giving rise to this complain happened in this district. Furthermore, plaintiff (I) resides and defendants maintains business in this district.

### Parties

3. Plaintiff, Allison Hall resides at 90 Columbia Street Apt 5C, New York, NY 10002.

1.



4.  Defendants John Jay College of Criminal Justice of The City University of New York  maintains business at 899 Tenth Avenue New York, NY 10019 (Office of Legal Counselor) AND The City University of New York maintains business at 535 East 80th Street New York, NY 10075 (Office of General Counsel).

## Statements of Facts

5.  I am the claimant in this matter and I submit this affidavit in support of my charge of discrimination and retaliation.  Defendants John Jay College of Criminal Justice of the City University of New York ("John Jay") and the City University of New York ("CUNY") (collectively "respondents") discriminated against me on the basis of sex discrimination, including sexual harassment and retaliation, as set forth in this affidavit.

## Background

6.  I worked at John Jay from about September 1, 2009 until my termination January 18, 2011.  I am also a student in the master's degree program in criminal justice.  I am 24 years old.

7.  John Jay is a four-year college with undergraduate and graduate programs specializing in criminal justice education.  It is a member of CUNY.

8.  Through the CUNY Counseling Assistantship Program ("CUNY CAP"), I worked as a Counseling Assistant in John Jay's SEEK (Search for Education,

2.

Evaluation and Knowledge) Department, which provides access to higher education to students who would not otherwise be eligible to attend John Jay. The department provides academic support and counseling services to SEEK students.

9. As a Counseling Assistant, I provided academic advice to SEEK students, helped SEEK counselors with their work, attended SEEK committee meetings, and participated in SEEK student events. I worked about 20 hours each week in the SEEK Department. In return, I received hourly pay in addition to tuition reimbursement for up to six credits per semester.

10. I had an annual contract with John Jay, which could be renewed at the end of the academic year. My most recent contract, signed in the fall of 2010, reappointed me to the CUNY CAP program for a period from September 1, 2010 to June 30, 2011.

11. I behaved in a professional manner while at SEEK and produced high quality work. My supervisors and co-workers complimented my work and I received positive scores on all my performance reviews. For example, in a November 3, 2010, email, Cheryl Franks, an associate professor at John Jay, emailed me and my supervisors to thank me and another CUNY CAP for attending her class. She wrote, "You were the utmost professionals, supportive and informative. It was a huge help to me and the entire class".

3.

<u>Sexual Harassment by Rafael Santana</u>

12. During the Fall 2010 semester,  Rafael Santana ("Santana") began working in the  SEEK Department as a Counselor.

13. Santana was not qualified to be a counselor in the SEEK Department.  He was a John Jay College graduate in the field of Criminal Justice.  He told me that he was hired over qualified candidates because he have "connections in the college and in the SEEK Department".  An African American woman from the SEEK Department who have many years of counseling experience, was not rehired as a counselor.  However, Santana, who have no counseling experience was hired. Matter of fact, Santana was just a tutor with no counseling experience before he was hired to be a counselor.

14. As described below, over the course of the next several months, Santana repeatedly asked me inappropriate questions about my personal life, share inappropriate facts about his life, touched me and made sexual remarks to me. When I rebuffed his advances, he filed a complaint against me for alleged inappropriate conduct.  Rather than investing Santana's behavior, John Jay fired me.

15. John Jay College did not offer any sexual harassment training, nor did they have any advertising in the department of who to contact if harassment was taken place.

16. My first interaction with Santana was October 6, 2010.  He and I were

4.

walking to a training session together and Santana asked about my daughter, whom he had seen in the office on another occasion. When I asked about his children, he told me he did not have children and, without any prompting, told me that he had just broken up with his girlfriend of 10 years.

17. When we arrived at the training session, Santana sat next to me, though there were other empty seats in the room . After the session, Santana left, while I stayed to speak with some of my co-workers. However, when I eventually left the building, Santana was waiting outside, and he and I walked back to the office together.

18. over the courses of the next several weeks, Santana repeatedly asked me to come to his office to assist him with his work, though I am able to complete these task at my desk. He also repeatedly asked me to help him with the SEEK Department software, known as SIMS. However, I explained to Santana that I was unfamiliar with the SIMS software and, in fact, Santana and I began learning to use the software on the same day. Nevertheless, Santana continued to ask me for help using SIMS. I often did not know the answers to his questions, and would have to ask department supervisors for help.

19. Santana also asked me to help him remove a "K Stop" – which prevents a student from registering for classes without first speaking to a SEEK counselor – from a student's record. I explained to Santana that I did not

5.

know how to do this. Nevertheless, he continued to ask me to come into his office and help him remove K Stops.

20. When I suggested to Santana that he should ask other more knowledgeable department employees for help, he said words to the effect of, "I'd rather ask you".

21. On October 11, 2010, Santana called me into his office to help him register students. Without any prompting from me, he told me that he used to live with his ex-girlfriend in an expensive condominium, but recently moved back to his mother's house. He told me his ex-girlfriend frequently called him. He also said he was happier now because he did not have to pay for the expensive condominium. He said words to the effect of, "I can show you my bank account but I don't want to come off like that". I told him I was not interested in seeing his bank account.

22. On October 1, 2010, Santana asked me to come to his office to help him with SIMS. On the way, I overheard students discussing the new movie "The Social Network", which is about the founding of the social networking website Facebook. I asked Santana if he had a Facebook account. However, while we were in his office, Santana logged into Facebook and began looking for my profile. When he was unsuccessful, he told me to add him as a "friend". I added Santana as a Facebook friend when I got home that night; I did not think much of doing this since I have more than 600 "friends" on

6.

Facebook, including several other SEEK employees.

23. Over the course of the next several months, Santana initiated numerous in-appropriate personal conversations with me, many of them of a sexual nature. For example, he asked me how old I was when I conceived my daughter, about my relationship with my daughter's father, if I was ever married, and the length of my longest intimate relationship. He asked me if I ever dated anyone at John Jay, to which I replied, "no". When he asked me how many boyfriends I have had, I told Santana that I have only one romantic relationship and that I was still dating my boyfriend. Santana replied, "you need to be in some more relationships so you can toughen up". Santana also invited me several times to come to his Jujitsu class with him. None of these conversations were initiated by me, nor were they welcome. Because Santana was my superior in the SEEK Department, I did not want to be rude to him and risk jeopardizing my job; I tried steering the conversation in other directions.

24. When male students would come to the department to visit me, Santana would make jokes about me receiving male visitors. He once remarked that I should date these students. On one occasion, Santana came to my desk and asked me if I had ever dated anyone off a social networking site. I told him that I did not do that.

25. I spoke to another SEEK Counselor, Justyna Jagielnicka (Tasha is what we

called each other), several times about Santana's personal comments. On one occasion, she said "I think Santana likes you" On another Occasion she said I should talk to Santana.

26. On October 27, 2010, Santana sent several "inappropriate and disrespectful" text messages to my boyfriend's cell phone number, from his cell phone number. Prior to this, my boyfriend received several prank calls from John Jay College SEEK Department's phone number.

27. On October 29, 2010, I was in Santana's office when Jagielnicka came in and asked Santana if he was planning on attending SEEK Fest, an annual party that the department holds for SEEK students. Before answering, Santana asked me if I was going. When I said yes, Santana said he would attend as well.

28. When I arrived at the party, Jagielnicka approached me and told me words to the effect of, "Santana has been pacing the room looking for you. As soon as you came in, he stopped and his eyes were fixated on you". Later, Santana approached me and said "Hi Miss CUNY CAP, you are looking pretty today as usual". I walked away to find Jagielnicka.

29. When I told Jagielnicka what happened, she took me to see Sandy O'Neil, a SEEK teacher. I told O'Neil that Santana had been asking me personal questions and that I was bothered by his behavior. O'Neil said that Santana was probably interested in me and would like to ask me out but would not do

8.

so because of potential sexual harassment problems.  O'Neil asked me if I
"liked" Santana; I replied that I was not romantically interested in Santana.

30. On November 1, 2010, I went to see O'Neil again to discuss Santana's
behavior.  Though O'Neil discussed sexual harassment generally, he did not
give me any advice about how to deal with Santana or offer to speak to
Santana about his behavior.

31. On November 3, 2010, the SEEK Department its students to see "The Social
Network" movie.  Before the movie, Santana asked me to sit next to him.  His
request made me uncomfortable but because I worked for him, I agreed.  I was
sitting with him, then when I went to the rest room and came back to the
theater room Santana was no longer sitting in the seat beside me, but in a seat
at the end of a row next to a wall.  I sat in my initial seat, then some of his
SEEK students told me that Santana wanted to speak to me. I got out of my
initial seat and went to where he was sitting. He asked me to sit at the end of
the row next to the wall with him.  I went to my initial seat and gathered my
belongings and sat next to him.  During the movie, Santana put his hand on
my thigh.  I tried to shake his hand off but he would not move it.  That night
when I got home, I cried all night and could not sleep.

32. After the incident, at the movie theater, I tried to avoid Santana, though he
repeatedly asked me to come to his office.

33. On November 24, 2010, I had to go to Santana's office so he could sign a

9.

transfer request for a student.  As he was signing the form, he mentioned that he planned to buy two television sets that weekend, one for himself and one for his mother.  To be friendly, I asked him what size (how many inches) television he would buy for his mother.  Santana replied, "How many inches, Allison? You want to know how many inches I am working with?".  I reiterated that I was talking about the size of the television.  He said "Oh" and grinned.

34. As I was leaving his office,  Santana grabbed my hand and pulled me towards him.  I resisted.  Santana said word for word to the effect of, "I make $38.91 an hour as a SEEK Counselor, so I can afford you, and I have my tutoring gig on the side." I did not respond and left his office.

35. I went home afterwards and cried.  I could not sleep the whole weekend because I was so upset by Santana's behavior.

36. On November 25, 2010, over Thanksgiving dinner, I reported Santana's inappropriate behavior to family members.

37. During the month of November, my boyfriend went into my cell phone and read text messages between myself and Jagielnicka.  He read that I was complaining to her about Santana's sexual harassment.  He also read that she was encouraging his behavior and was telling me to leave him (my boyfiend) and for me to date other men.

Retaliation After I Rejected Santana's Advances

38. On information and belief, on November 29, 2010, Santana sent an email to
Monika Son, the CUNY CAP supervisor, in which he said he would prefer to
work with Syeda, the other CUNY CAP, because she was more familiar with
his caseload.  This statement is incorrect, because I had worked on Santana's
cases the entire semester and coincidentally after I rejected his advanced he
sent an email to my supervisor requesting to take his casework away from me.

39. On December 1, 2010, I went to see Jagielnicka to discuss Santana's behavior.
she suggested we go to the conference room.  When we got there, Car
Williams (deceased), an associate professor of the SEEK Department was
already there.  Jagielnicka suggested that I speak with Williams and left
shortly thereafter.  When Williams asked me what was wrong, I was afraid to
tell him the truth for fear of losing my job.  So I told him nothing was wrong.

40. Later that day, I went to speak with Santana and asked him why he had asked
to have a different CUNY CAP work on his caseload.  I also expressed
concerned about my reputation at work.  He brushed off my concerns and said,
"With a beautiful face like yours, who can say no to you?"

41. Later that day, I went back to Santana's office and told him, in Spanish,
words to the effect of, "I do not like you and you have been making me feel
uncomfortable."  Rather than respond, Santana told me I had spoken
incorrectly and needed to repeat myself with a Spanish accent.  I told him I

11.

was serious and that he should "back off." He gave me a stern look and I walked away.

42. On information and belief, later that day, Santana filed a complaint with the SEEK Department, alleging that I had engaged in inappropriate behavior.

43. That day, Dr. Dara Byrne ("Byrne"), the SEEK interim director, sent me an email in which she scheduled a meeting with me "to discuss reports of inappropriate behaviors in the department." I did not receive the email until the following day, December 2, 2010.

44. On December 2, 2010, I met with Byrne and Son in Byrne's office. Byrne told me that Santana had made a complaint of inappropriate behavior and that, as a result, they were suspending my SIMS access. I was unable to do my job without access to the SIMS account. Son told me that for the time being I would work for her, doing routine filing work. Son later told me that Silvia Montalban ("Montalban"), Assistant Counsel and Director of Affirmative Action in John Jay's Office of Legal Counsel, made the decision to suspend my SIMS account. I tried to explain that I was the one being sexually harassed and I did report it to Jagielnicka, but Byrne told me that I need to take it up with Montalban because her hands are tied.

45. On December 6 and 8, 2010, Santana continuously paced back and forth by my desk and spent long periods of time in the printer room, which is adjacent to my desk. While he was there, I saw him smirking at me. On December 8,

12.

46. 2010, Santana removed me from his list of Facebook "friends".

47. On December 8, 2010, Son called me into her office and told me that Montalban wanted to speak with me that afternoon. Son told me to write a report for Montalban about my interactions with Santana. However, Son instructed me to write that my encounters with Santana were casual and friendly, and to write that no sexual harassment had taken place. I wrote a report for Montalban but did not have time to finish it. Because of Son's instructions, I did not include all of Santana's inappropriate behavior in the report.

48. I met that afternoon with Montalban and another woman whose name I do not know. I gave Montalban my report and told her it was a draft. Montalban asked me a series of questions that suggested that I acted inappropriately towards Santana. For example, she asked if I had ever told Santana that I liked him and if I ever told Santana that I checked his sexual orientation on Facebook. Montalban warned me that I should not retaliate against Santana because of his complaint. I found this meeting to be very intimidating.

49. On December 13, 2010, Santana was sitting at my desk when I arrived at work. I was personally assigned to that desk as a work station by Byrne. Matter of fact, the only two people that were assigned to that desk was myself and Begum. I emailed Son that Santana's behavior was making me uncomfortable. Son initially told me that she would handle it, but then wrote back and told me

13.

to let Montalban handle the situation. I emailed Montalban several times, but, on information and belief, she did not do anything about the situation.

On this date, I felt that everyone was giving me the running around (Son and Montalban) and Santana was mocking me (by pacing by desk days prior and sitting and my desk). Furthermore, when I did report inappropriate behavior to Jagielnicka and O'Neil, my complaints were swept under the rug and I no longer felt safe and did not know who to trust, so I went to EEOC and filed a complaint of discrimination and sexual harassment against John Jay College.

50. On December 20, 2010, I received a letter from Montalban saying that her investigation was complete and that I should await a decision from Jeremy Travis, the president of John Jay.

51. During January 2011, I was on several occasions inexplicably dropped from classes for which I had registered.

52. On January 18, 2011, I met with Yvonne Purdie ("Purdie") in John Jay's Human Resources Department. She told me that I was being fired, but said she did not know why. She suggested that I ask Montalban. She gave me a letter, dated January 11, 2011, which stated that my employment as a CUNY CAP would not be renewed and that my employment would end December 31, 2010.

53. In December 2010, I learned that my contract with John Jay had been altered by Byrne, so that my previous end date of June 30, 2011, had been crossed out

14.

and an end date of December 31, 2010, was written in.

54. On January 18, 2011, I went to Montalban's office, but when she saw me coming, she closed her door and her assistant sais she was busy. I requested a meeting and sent her several follow-up emails, but she did not reply.

55. On January 18, 2011, after I left Montalban's office I went to the office of the president (Travis). His chief of staff Ms.Nieves, decided to speak with me instead. I told her that I was "fired" as per Purdie and would like to know the reason why. She told me that it was due to budget cuts and that John Jay College fired a lot of college assistants. I told her that I am not a college assistant, but a CUNY CAP and that my pay came from a separate budget. She excused herself from her office, then came back and told me that Montalban said I was fired because of "poor performance".

56. On January 18, 2011 I went to Byrne's office, I asked her why was I "fired" and she basically said that she do not know why and that she nor anyone of my superiors in the SEEK Department do not have any personal nor professional problems with me.

57. I filed an EEOC complaint December 13, 2010.

58. On January 24, 2011, Wayne Edwards ("Edwards"), John Jay's Dean of Students, called me on my cell phone to request a meeting at his office. I told him I did not feel comfortable doing so; we agreed to meet at a nearby deli the following day. On information and belief, Edwards put an "academic stop"

15.

on my record, which prevented me from adding or dropping classes, transferring to another CUNY college or taking classes at another college.

59. On January 25, 2011, Edwards cancelled our meeting. He told me I had to meet with him in his office and said he would not remove my academic stop until I do so.

60. On January 26, 2012, I spoke with Robert Fisher ("Fisher") at the John Jay Bursar's Office. He told me that I needed to bring a copy of my Spring 2011 tuition waiver. This document should have already been on file (as the previous semesters). I was very suspicious at this moment. On or about that time, I attempted to sign up for classes outside of John Jay, but was unable to do so because of the academic stop.

61. On January 28, 2011, I visited Keith Clark, my union representative from DC 37 at his office to discuss John Jay College covering up its sexual harassment and retaliating against me. He called Edwards while I was present. After speaking to Edwards, his assistant told her to relay a message to Clark that he was busy and would return his call. Edwards never returned Clark's phone call.

62. On January 28, 2011, I went to John Jay to drop off my tuition waiver. I attempted to enter the building with my school ID card, but the card no longer worked. Two security guards then told me that they wanted to escort me to see Isabella Curro ("Curro"), the director of John Jay security. I told the

16.

guards that this made me uncomfortable and that Curro could come to the lobby to speak with me. The guards told me that I was not allowed to enter the building until I met with Edwards. I was very frightened I called 911 several times.

63. I went to an adjacent John Jay building to request to speak to Edwards. Curro And three security guards entered the building. Curro called Edwards - on the security phone - who said I should come up to his office to speak with him. I again said that I felt uncomfortable doing so by myself. I heard Curro speak into her walkie-talkie, instructing the person on the other end to send an email to Edwards stating that I had stolen something from the school, which was not true.

64. Edwards then came down to the lobby. I told him I only wanted to pay my bursar bill, but Edwards said he would not grant me access to the building unless I spoke to him in his office. I said I would not do so without my union representative whom he told his secretary he would contact later – from a called he received earlier from my union representative -. After this conversation, I left the building.

65. On February 3, 2011, Edwards wrote in an email that he was not the appropriate person for my union representative to speak to, and referred me to Rosmarie Maldonado, Assistant Vice President of Legal Affairs and Counsel to the president.

66. On February 4, 2011, I received a letter from Edwards, dated January 31, 2011, stating that I was suspended until February 8, 2011. The stated reasons were "interfering with the institution's educational processes or facilities"; "failure to comply with lawful directions issued by representative of the college"; and "theft from college premises." The letter stated that I would have to go in front of school disciplinary committee.

67. On information and belief, Edwards did not follow school policy regarding students disciplinary procedures, which requires him to hold an informal conference, advise the student of the charges against them, and ask the student for responses, before initiating disciplinary proceedings.

68. On February 16, 2011, Edwards emailed me that my suspension was lifted and that I could register for classes. He also requested that we meet in his office. However, on information and belief, the academic stop was still on my record and, at that late date, all of my Criminal Justice classes were already full. Even if I had been able to return to school at this point, I would have missed four weeks of class, making it extremely difficult to catch up.

69. On February 18, 2011, I hired Milton L. Williams Jr from Vladeck, Waldman, Ellias and Engelhard, P.C. to represent me in my suit against John Jay. Prior to hiring Williams, he was the one that called me and persuaded me to hire him.

70. On February 18, 2011 at Vladeck et al law firm and in front of my witness, I

18.

asked Williams if he have any affiliation with John Jay College (socializes, friends with, know anyone there or work with anyone at the college). He told me no, so I signed the contract to hire him as my lawyer to represent me against John Jay College.

71. On April 5, 2011, Williams invited me to his office. He told me that he contacted Maldonado who is a friend of his, that he forgot works at John Jay College. He told me that as per his conversation with Maldonado, he believe that I should settle with John Jay College. When I told Williams that I will not settle, he told me that he can no longer represent me because he do not want to hurt his relationship with Maldonado. He terminated our contract even though I did not ask him to.

72. After April 5, 2011, I did my research and found out that Williams and Maldonado serves on the New York City Board of Corrections. Also, they are two of nine board members making it impossible for them not knowing each other and knowing where each other work given the fact that they serves as members for years and the board comprises of just seven other people.

73. Based on the foregoing, I believe respondents discriminated against me based on my sex and retaliated against me for making protected complaints of discrimination.

## Claim 1

74. (Violation of Civil Rights: sexual harassment, retaliation, and discrimination

based on sex and color. Under Title VII of the Civil Rights Act of 1964.

75. Defendants covered up sexual harassment by turning a blind eye, then retaliating by firing me and banding me from pursuing my education.


## Claim II

76. Defendants violated a written work contract.  Defendants changed my work contract end date from June 30, 2011 to December 31, 2010.  They tampered with my contract to fire me.


## Request for Relief

WHEREFORE, the plaintiff request:

77. Readmit back into John Jay College Master's Program or the ability to transfer out of the school or take classes at other CUNY schools.

78. ALL stops removed from my academic and employment record.

79. ALL allegations be cleared from my academic and employment record.

80. Nine (9) college credits (the least) given for classes that I would have had to date if John Jay College did not prevent me from pursuing my education. I need a total of 15 credits to graduate with my Master's degree.  As a matter of fact I could have had my Master's degree to date.

81. Rehired back in John Jay College as a CUNY CAP or a College Assistant.

82. Income reimbursement lost from December 31, 2010 to present.

20.

83. Damages include pain and suffering, general and special damages, according to proof.

84. Damages in the amount of six million ($6,000,000).

85. Any further relief which the court deem appropriate.


<u>Demand for Jury Trial</u>

86. Plaintiff hereby request a jury trial on all issues raised in this complaint.


Sworn to before me this
_____ Day of February, 2012

Notary Public

ANTHONY R. FERNANDEZ
Notary Public, State of New York
Qualified in New York City
No. 01FE6219879
My Commission Expires 04/05/2014

ALLISON HALL
Plaintiff in Pro Per

21.

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Allison Hall<br>90 Columbia Street<br>Apt. 5c<br>New York, NY 10002 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
| --- | --- | --- | --- |

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |
| --- | --- | --- |

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| 520-2011-00882 | Emily F. Haimowitz,<br>Investigator | (212) 336-3759 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_Kevin Berry  j.w._     11/15/2011
(Date Mailed)

**Kevin J. Berry,**
**District Director**

Enclosures(s)

cc:  Abby L. Jennis
Office of the General Counsel
The City University of New York
535 East 80th Street
New York, NY 10021